**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 1:24-cr-00231 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Reuben J. Sheperd |
| CHARIECE CHEW, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**OPINION AND ORDER**

Following a five-day trial, a jury found Defendant Chariece Chew guilty of two counts of conspiring to make straw purchase of firearms and two counts of possessing a firearm as a convicted felon.  Also, the jury returned verdicts of not guilty on two counts of aiding and abetting making a false statement in the acquisition of a firearm. Defendant seeks a new trial, alleging that prejudicial information disclosed to the jury provides grounds for a mistrial and that his trial counsel provided ineffective assistance.

**FACTUAL AND PROCEDURAL BACKGROUND**

The indictment charged Mr. Chew with conspiring to have Kathryn Coe purchase four firearms on his behalf, knowing that he had a prior conviction which made him ineligible to purchase or possess firearms.  (ECF No. 27, PageID #187–91.) Because the purchases occurred on two separate dates, February 22, 2024 and February 29, 2024, Mr. Chew faced a set of three charges for offenses on each date, for a total of six charges.  (*Id.*)  In sum, he faced two counts of conspiring to make

1

straw purchases of firearms under 18 U.S.C. § 932(b)(1) and (c)(1), two counts of aiding Kathryn Coe in making false statements to acquire firearms under 18 U.S.C. § 922(a)(6) and (2), and two counts of possessing firearms as a felon under 18 U.S.C. §§ 922(g)(1) and 924(a)(8).  (*Id.*)

### A.    Pretrial Proceedings

In advance of trial, the parties reached stipulations to remove from dispute certain elements of these charges.  Specifically, they stipulated that Mr. Chew had a prior conviction for a crime punishable by more than one year imprisonment.  (ECF No. 67.)  Also, they stipulated that the firearms traveled in interstate commerce. (ECF No. 23.)

In the week before trial, the prosecutors received and shared information that one of the firearms purchased through the straw purchases at issue was recovered in California.  (ECF No. 68, PageID #519.)  Defendant filed a motion *in limine* to exclude this evidence based on its late disclosure and potential prejudice.  (ECF No. 68.)  At a hearing on the motion, the Court noted that the firearm was recovered before the deadline for discovery, defense counsel did not have an opportunity to investigate this new information, and any inferences from this evidence would be speculative.  (ECF No. 85, PageID #716 & #722.)  Therefore, the Court granted Defendant's request to exclude this fact from trial.  (*Id.*, at PageID #723.)  In doing so, the Court cautioned the parties against eliciting detailed testimony about recovery of the firearm, noting that doing so risked creating "fictional facts."  (*Id.*, at PageID #723–24.)

2

### B.     Trial Testimony

At trial, the United States presented the testimony of nine witnesses.  First, Alan Johnson, a friend of Mr. Chew who knew him from living most of his life in California, testified that he (Johnson) moved to Akron, Ohio.  (ECF No. 86, PageID #958–59.)  Around early March 2024, Johnson hosted Mr. Chew at his apartment in Akron and allowed him to use his car.  (*Id.*, PageID #960–61.)  At the start of Mr. Chew's visit, Johnson picked him up from a Greyhound bus station in Akron. (*Id.*, PageID #961.)  Johnson also testified that he (Johnson) had a felony record and was currently on federal probation.  (*Id.*, PageID #965–66 & #970–72.)

The second witness, Ashlee Frank, introduced herself as the federal probation officer supervising Alan Johnson.  (*Id.*, PageID #982–84.)  Frank indicated that she conducted a "walk-through home inspection" of Johnson's apartment on March 14, 2024 and did not observe any firearms.  (*Id.,* PageID 982–83.)  In response to questions whether Johnson and Mr. Chew previously lived near each other in California and Oregon, she testified that they were "detained together" in California and "housed together" in Oregon.  (*Id.*, PageID #984 & #987.)

At side bar, defense counsel agreed not to ask further questions that might reveal that Mr. Chew was housed with Johnson in prison.  (*Id.*, PageID #989–91.) To aid in the presentation of the evidence, the Court permitted jurors to ask questions in writing of the witnesses. When jurors submitted written questions asking whether Mr. Chew and Johnson were imprisoned together, the Court and counsel agreed not to ask Frank those questions.  (*Id.*, PageID #993–94.)  Further, they agreed that the issue would be addressed through the parties' stipulation to Mr. Chew's criminal

record and the Court's standard instruction not to make impermissible inferences from that record.  (*Id.*, PageID #994 & #1021–22.)

Kathryn Coe testified next and at greater length.  Coe met a man named Charles through a dating app and proceeded to communicate with him by text message.  (*Id.*, PageID #997–99 & 1058–61.)  In February 2024, she met him in person for a sexual encounter when he was visiting Ohio.  (*Id.*, PageID #997–1002.)  Coe identified Mr. Chew in the courtroom as the man whom she knew as Charles.  (*Id.*, PageID #1002.)  She testified that Mr. Chew told her the Ohio apartment at which he was staying belonged to his brother.  (*Id.*, PageID #1210.)  Also, he indicated that he was starting a security business and needed her help acquiring firearms because he was previously in jail.  (*Id.*, PageID #1004–05 & 1106–08.)

Soon after their first meeting, on February 22, 2024, Coe and Mr. Chew met again.  (*Id.*, PageID #1005-06.)  This time, they drove to a gun shop named the Cleveland Armory.  (*Id.*)  Mr. Chew gave her cash and instructions while she went inside and purchased two specific gun models he requested.  (*Id.*, PageID #1005–08.)  When she did not have enough cash to complete the purchase, she returned to the car, and he gave her more.  (*Id.*, PageID #1008.)  When she had questions while in the store, Mr. Chew provided further instruction by text message.  (*Id.*, PageID #1009.)  To complete the purchase, Coe represented verbally and on signed legal documents (including ATF Form 4473) that she was buying the firearms for herself. (*Id.*, PageID #1015-1020.)  After the purchase, she gave the firearms to Mr. Chew and dropped him off at the house where he was staying.  (*Id.*, PageID #1027.)

A few days later, Mr. Chew reached out to Coe again and proposed the purchase of two more firearms. (*Id.*, PageID #1028-29.) On February 29, 2024, he drove to her house and brought her back to the same gun store. (*Id.*, PageID #1029–30.) When she arrived, store staff informed her that they could not sell her more guns because "the computers were down." (*Id.*, PageID #1029–30.) Mr. Chew took Coe for a meal at a nearby restaurant, Yours Truly; then they went to the Parma Gun Shop. (*Id.*, PageID #1034–40.) At the Parma Gun Shop, Mr. Chew again provided Coe with cash and instructions regarding which two firearms to buy. (*Id.*, PageID #1040–41.) Again, Coe signed ATF Form 4473 attesting that she was purchasing the guns for herself. (*Id.*, PageID #1043–45.) Coe testified that Mr. Chew gave her $40 for her assistance and that Mr. Chew stopped contacting her after that day. (*Id.*, PageID #1048–49.)

On both February 22 and 29, 2024, Coe's time at the gun stores and in their respective parking lots were captured on video camera. (*Id.*, PageID #1010-11, #1026-27, #1030–35, #1041–43 & # #1423.) She was also captured on camera with a black male she identified as Mr. Chew inside the restaurant on February 29, 2024. (*Id.*, PageID #1036–39.)

Ultimately, Coe pled guilty to charges of straw purchasing firearms and making a false statement to purchase a firearm. (*Id.*, PageID #1081–83.) Also, she agreed to testify against Mr. Chew. (*Id.*, PageID #1072.)

The next witness, George Cervantes, testified as a representative from the company that owns Greyhound. (ECF No. 87, PageID #1231–32.) He testified that

Greyhound sold a ticket for a bus trip from Hayward, California to Akron, Ohio to a passenger named Chariece Chew. (*Id.*, PageID #1236–39.) This trip was scheduled to leave Hayward, California on February 15, 2024 and arrive in Akron, Ohio on February 19, 2024 by way of Amarillo, Texas and several other intervening stops. (*Id.*) He noted that the passenger in question ultimately missed a connecting bus in Amarillo, Texas and purchased a new ticket in cash to complete his journey to Ohio. (*Id.*, PageID #1241–45.) A few days later, Greyhound sold another ticket for a passenger named Chariece Chew who was departing Akron, Ohio on March 7, 2024 and arriving in Modesto, California on March 16, 2024 after stopping in Houston, Texas. (*Id.*, PageID #1252–53.)

Manuel Perez testified that he was "employed with the government" and based in Oakland, California. (*Id.*, PageID #1263-64.) Perez indicated that he knew Mr. Chew through his government employment and had been in regular contact with Mr. Chew since January 2024, even visiting him at his home. (*Id.*, PageID #1264.) When the ATF was investigating this case in April 2024, Perez assisted by identifying Mr. Chew in a photograph they provided and by sharing information such as Mr. Chew's home address in Hayward, California. (*Id.*, PageID #1266–67.) He testified that he conducted a "walk-through home inspection" of Mr. Chew's house on April 18, 2024 and did not observe any guns at that time. (*Id.*, PageID #1270–71.)

At side bar, counsel conferred with the Court and noted that Perez had been instructed not to say that he was a probation officer, but a written question from the jury asking in what capacity he worked with Mr. Chew was "inevitable." (*Id.*, PageID

6

#1272.)  The Court and parties agreed not to put to the witness any of several jury questions that asked about the relationship between Perez and Mr. Chew or whether Mr. Chew was under travel restrictions at the time of the incidents.  (*Id.*, PageID #1272–73.)

Jason Bowser testified as the employee of Cleveland Armory who sold two firearms to Kathryn Coe on February 22, 2024, assisted her with Form 4473, and carried the firearms out to her car.  (*Id.*, PageID #1280 & #1291–99.)  He was also the store employee present when Coe returned to the store on February 29, 2024 and could not make a purchase because the system was down.  (*Id.*, PageID #1308.)  Coe's desire to purchase two more identical guns a week after her previous purchase made Bowser suspect her of straw purchasing.  (*Id.*, PageID #1307–12 & #1319–20.)  He discussed his suspicions with a local police officer who happened to be present in the store, and the officer photographed the license plate of the vehicle Coe was in before she left.  (*Id.*)

The next witness, Robert Little, identified himself as an ATF intelligence research specialist.  (*Id.*, PageID #1327.)  Little tracked cell phone tower location data associated with the (510) 746-6038 phone number that Kathryn Coe used to converse with the man she knew as Charles.  (*Id.*, PageID #1338–41.)  Little found that the cell phone's location data followed the geographic routes associated with the Greyhound bus tickets purchased in the name of Chariece Chew.  (*Id.*, PageID #1343–61 & #1377–84.)  Also, he noted that, on February 22, 2024, the cell phone traveled from the area of Alan Johnson's house in Akron to the area of the Cleveland

7

Armory and back again.  (*Id.*, PageID #1366–71.)  Little tracked the phone's movements on February 29, 2024 from the area of Johnson's home to Coe's home, to the vicinity of the Cleveland Armory and the nearby Yours Truly restaurant, to the vicinity of the Parma Gun Shop, before returning to Coe's residence and then Johnson's.  (*Id.*, PageID #1374–77.)  He also found that the same phone was in the vicinity of Mr. Chew's California residence on April 18, 2024, the day that Perez visited him there.  (*Id.*, PageID #1387–90.)

At a side bar, defense counsel noted that the United States briefly published a document, Exhibit 53, whose last page contained the unredacted words "probation officer verified," referring to Manuel Perez.  (*Id.*, PageID #1390–91.)  Although the United States filed and shared this 35-page exhibit in advance of trial, the language was overlooked.  (ECF No. 49-2, PageID #363.)  Counsel for the United States indicated that he would not use the exhibit again.  (ECF No. 87, PageID #1390–01.)

The next witness was Dan Jambor, owner of Parma Gun Shop.  (*Id.*, PageID #1412–13.)  He testified that he sold a pair of guns to Kathryn Coe on February 29, 2024, verbally confirmed that she was purchasing them for herself, and gave her Form 4473 to complete.  (*Id.*, PageID #1413–15.)

### C.    Testimony of Special Agent Cory Miles

The final witness was the lead investigator, ATF Special Agent Cory Miles. His detailed testimony spanned more than a day.

Miles began by outlining the course of his investigation.  He explained that the investigation began after he received a tip from the police officer who observed Coe at Cleveland Armory and photographed the license plate of the car she was in.  (*Id.*,

8

PageID #1431–33.)  Miles tracked the license plate back to Alan Johnson and acquired all surveillance footage of Coe that the Cleveland Armory and Parma Gun Shop could provide.  (*Id.*, PageID #1433–36.)  He interviewed Coe, who immediately showed receipts and confessed to buying the firearms on behalf of Charles, a man she met through online dating.  (*Id.*, PageID #1442–45 & #1448.)  Coe also identified the house where she and Charles met in person.  (*Id.*, PageID #1446–48.)  Miles knew that house was Johnson's residence.  (*Id.*)  Coe allowed Miles to look through her cell phone for pertinent information.  (*Id.*, PageID #1448.)

Miles tracked the (510) 746-6038 phone number Coe provided as Charles' point of contact to a subscriber account based in Hayward, California.  (*Id.*, PageID #1450–51.)  To determine Charles' identity, Miles also asked Coe to participate in two photo lineups as well as further interviews.  (*Id.*, PageID #1454–59; ECF No. 88, PageID #1546–49.)  From these interactions, Miles learned that Coe's descriptions of the suspect did not match the appearance of Alan Johnson.  (*Id.*, PageID #1518.)  Through deeper analysis of Coe's cell phone, he eventually found a photograph of the individual with whom Coe had been communicating.  (ECF No. 87, PageID #1461–66.)  Social media analysis and other forms of research allowed the ATF to match this photograph to the name Chariece Chew and an associated date of birth.  (*Id.*, PageID #1466–67.)

At this point, counsel for the United States asked Miles, "Now, in addition to the date of birth, were you able to obtain information about where he lived?"  (*Id.*, PageID #1467.)  Miles responded, "Yes. Once I had the date of birth, I then proceeded

9

with a law enforcement query on him with identifiers, and I was able to determine that he was on supervised release." (*Id.*)

### C.1.   Disclosure of Supervised Release Status

At the words "supervised release," defense counsel objected immediately, and the Court held a side bar on the record. (*Id.*)  Noting that it was already 5:00 pm, the Court dismissed the jurors for the day and proceeded to discuss with counsel how best to handle the disclosure of Mr. Chew's supervision status. (*Id.*, PageID #1467–77.) No lawyer suggested that the Court take other action or give a curative instruction before sending the jurors home for the day.  Counsel for the United States suggested that the Special Agent merely "slipped" and that a curative instruction would remedy the problem. (*Id.*, PageID #1470.)  Defense counsel expressed frustration over Miles' indiscretion but suggested that the parties consult the relevant law and present reasoned argument the next morning. (*Id.*, PageID #1471-72.)  The Court agreed with defense counsel's suggestion and agreed to decide the matter when the parties reconvened in the morning. (*Id.*, PageID #1472 & #1475.)

In the morning, defense counsel moved for mistrial based on Miles' disclosure; she cited the five-factor test prescribed in *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir.2003), as the appropriate framework. (ECF No. 88, PageID 1488–89.)  She argued that, although counsel for the United States seemed not to have intentionally elicited the disclosure, Special Agent Miles' intent could be inferred from the fact that he was aware of the steps taken to shield the jury from knowledge of Mr. Chew's status as a recent criminal offender and as a person on supervision. (*Id.*, PageID #1489–90 & #1492.)  Additionally, she argued that the Court's failure to provide the jury with a

10

curative instruction before breaking at the end of the prior day weighed in favor of granting the motion. (*Id.*, PageID #1490–91.) Although jurors would necessarily know of Mr. Chew's criminal past, defense counsel maintained that knowledge that he was on supervised release "create[d] an additional layer of questions" and threatened unnecessary prejudice. (*Id.*, PageID #1492–94.)

Counsel for the United States emphasized that the role and testimony of Manuel Perez was material to the case because his positive identification of Mr. Chew using the photograph from Coe's cell phone became the investigation's critical breakthrough. (*Id.*, PageID #1495–96.) Also, it was critical to the government's case that cell phone number (510) 746-6038 was in the vicinity of Mr. Chew's residence when Perez conducted a home visit on April 18, 2024. (*Id.*, PageID #1496–97.) The United States argued against defense counsel's inference of Miles intent, stating that Miles' disclosure was accidental and brought "no conceivable benefit" to the prosecution. (*Id.*, PageID #1496–97.) The United States contended that a limiting instruction would be sufficient and that the disclosure constituted a small part of the evidence. (*Id.*, PageID #1497.) While maintaining that the disclosure was accidental, the United States also argued that the fact of Mr. Chew's probation status was more probative than prejudicial. (*Id.*, PageID #1498–1500.) Not only was his criminal history necessary as an element of the charged offense, but the evidence from his probation officer was central to the case. (*Id.*)

11

After receiving these arguments and reviewing the law and testimony, the Court denied defense counsel's motion for mistrial and provided reasoning that followed the five-factor framework prescribed in *Zuern*. (*Id.*, PageID #1500–08.)

### C.2.  Evidence of the Recovered Firearm

When Miles resumed his testimony, he explained that he shared the photograph from Coe's phone with Perez and that Perez was able to identify the man in the photo as Chariece Chew. (*Id.*, PageID #1536.)  From interviewing Johnson, Miles learned that Mr. Chew traveled to Ohio by Greyhound bus.  (*Id.*, PageID #1542–43.)  The Greyhound travel records he then acquired included a phone number Perez had identified as Mr. Chew's as well as a phone number associated with Mr. Chew's known Hayward, California address. (*Id.*, PageID #1545.)  Ultimately, the evidence he uncovered was consistent with Kathryn Coe's statements.  (*Id.*, PageID #1539–40.)

Defense counsel's cross examination of Special Agent Miles reviewed his investigation in detail.  In particular, she used her questioning to suggest that he might have received Coe's statements too uncritically.  (*Id.*, PageID #1567–73, #1583–86, #1609–12, #1619–22, #1630–38, #1641–43, #1661, #1674–75 & #1687.) Also, she emphasized the questions his investigation did not answer and the investigative angles he declined to pursue. (*Id.*, PageID #1565–66, #1583–95, #1599–1600, #1604–05, #1617–18, #1641–55, #1664–66, #1679–80, #1685 & #1688.)

Near the end of cross examination, defense counsel asked Miles about the fact that the prosecution was not able to present the guns at issue at trial:

Q: You have to [show an illustrative exhibit] because there are no guns here, right?

A: Correct?

Q: You would agree with me that there are no guns sitting at this table?

A: Correct.

Q: There are no guns at the back table.

A: Correct.

Q: And in fact, you have not seized any of these guns. Is that correct?

A: I have not personally seized any of these guns.

Q: ATF is not in possession of any of these weapons. Is that correct?

A: That is correct.

(*Id.*, PageID #1670.)

Outside the presence of the jury, counsel for the United States argued that this line of questioning stood at odds with the Court's pre-trial ruling to exclude the late-obtained evidence of firearm recovery. (*Id.*, PageID #1689-90.) By eliciting this testimony, in the view of the prosecutor, defense counsel created a false impression and opened the door for the United States to clarify that one of the guns had been recovered. (*Id.*)

Defense counsel responded by stating that she was merely following up on a question asked during direct examination; however, it was determined that she misremembered the earlier testimony. (*Id.*, PageID #1690–91 & #1696.) The Court granted the United States' limited request to elicit the fact that a firearm connected

with this case had been recovered.  (*Id.*, PageID #1693–95.)  Consequently, counsel

for the United States elicited testimony from Special Agent Miles that one of the

firearms was recovered in Berkeley, California:

> Q: And as recently as August 4th, 2025, did you do a check to see if any of these guns have been recovered?
>
> A. Yes, I did.
>
>       *      *      *
>
> Q. Okay. And did you determine whether one was recovered?
>
> A. Yes.
>
> Q. And was one?
>
> A. Yes, a firearm was recovered:
>
> Q. Was it one of the firearms a Mini or Micro Draco recovered in this case?
>
> A. Yes.
>
> Q. And where was it recovered from?
>
> A. In Berkeley, California.

(*Id.*, PageID #1700–01.)  Following the testimony of Special Agent Miles, no juror had

a question for him about recovery of the firearm.  (*Id.*, PageID #1724–25.)  During

deliberations, the jury asked a question about the aiding and abetting counts, but did

not ask a question directly or indirectly related to the recovery of the firearm.  (ECF

No. 90, PageID #1918–19.)

In closing argument, the prosecutor told the jury, "one of the guns was

recovered, and it was recovered in California.  And where is Chariece Chew from?

California." (*Id.*, PageID #1841.)  In response, defense counsel reminded jurors that

14

"we don't know anything about that.  We weren't given any details about that, and we still don't know where the other three are."  (*Id.*, PageID #1843.)  Further, she used the recovery of the firearm to argue on behalf of Mr. Chew:

> Special Agent Miles testified that the ATF is not in possession of any of these weapons.  I think he said something about one of these guns being recovered in California, but we heard nothing about the circumstances of that seizure, the gun isn't here to present as evidence, and you can believe that if they had tied that gun that they said is in possession of police in Berkeley, California, if they tied that gun to my client in any way, that would have been the first thing out of the Government's mouth.  They would have come here and said "we found a gun, and here is how we tie it to Mr. Chew," but that's not what they did, and that's not what they have.

(*Id.*, PageID #1860–61.)  There was no other reference to the recovery of the firearm during closing arguments.

### D.      Jury Instructions and Stipulations

Following the close of testimony, the parties modified their stipulations to include the fact that "Probation Officer Ashley Frank testified that Alan Johnson and Defendant Chariece Chew resided together in California and/or Oregon prior to 2024."  (ECF No. 79, PageID #658.)

Additionally, the Court and counsel worked together on a final jury instruction modifying the standard instruction limiting consideration of a defendant's past crimes to extend to Mr. Chew's status on probation or supervision.  (ECF No. 88, PageID #1509-1510.)  The final instruction reads as follows:

> You have heard testimony that the defendant committed crimes in the past other than the ones charged in the superseding indictment.  You can consider that evidence only as it relates to the United States' claims in Count 3 and Count 6 that the defendant had prior convictions punishable by imprisonment for a term exceeding one year and that he knew he had those convictions.  You must not consider it for any other

15

purpose. *Nor may you consider any other collateral consequences or restrictions imposed on Mr. Chew as a result of those crimes.*

(ECF No. 79, PageID #654) (emphasis added).)

The Court read these instructions and stipulations as part of the final charge. (ECF No. 90, PageID #1800–28.) During deliberations, the jury was provided with a paper copy of the instructions and stipulations. (*Id.*, PageID #1800.)

## ANALYSIS

Defendant requests a new trial under Rule 33 of the Federal Rules of Criminal Procedure. This Rule gives a court discretion to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "Motions for a new trial are not favored and are granted only with great caution." *United States v. Garner*, 529 F.2d 962, 969 (6th Cir. 1976) (citing *United States v. Hoffa*, 382 F.2d 856, 862 (6th Cir. 1967)).

A motion for a new trial involves a broad standard of review. *United States v. Turner*, 490 F. Supp. 583, 593 (E.D. Mich. 1979), *aff'd*, 633 F.2d 219 (6th Cir. 1980). Such a motion may raise the argument that the jury's verdict is against the manifest weight of the evidence, though that evidence might be legally sufficient for a finding of guilt. *United States v. Hughes*, 505 F.3d 578, 592–93 (6th Cir. 2007). On a motion under Rule 33, the court may act as a thirteenth juror, assess the credibility of witnesses, and weigh the evidence. *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998).

Still, "such motions are granted only 'in the extraordinary circumstance where the evidence preponderates heavily against the verdict.'" *Hughes*, 505 F.3d at 593

16

(quoting *Turner*, 490 F. Supp. at 593).  The court's role seeks to insure against a miscarriage of justice, such as where the judge disagrees with the jury's resolution of conflicting evidence.  *United States v. Ashworth*, 836 F.2d 260, 266 (6th Cir. 1988); *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).

## I.  Improper Testimony

First, Defendant requests a new trial on the grounds that Special Agent Miles' disclosure of his supervised release status was unfairly prejudicial and improper.  The Federal Rules of Evidence govern the propriety of testimony.  Relevant evidence— that which has any tendency to make a fact of consequence more or less probable—is generally presumed admissible.  Fed. R. Evid. 401 & 402.  However, even relevant evidence may be excluded at trial "if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  "Evidence is unfairly prejudicial if it 'makes a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.'"  *United States v. Roberts*, 88 F.3d 872, 880 (10th Cir. 1996).

Witness testimony that is "so clearly improper and prejudicial to the defendant that the harm could not be erased by any instruction which the court might give" may trigger a mistrial.  *United States v. Howard*, 621 F.3d 433, 459 (6th Cir. 2010) (internal quotation marks and citation omitted).  To guide this determination, the Sixth Circuit looks to five factors:  (1) whether the testimony was unsolicited,

17

(2) whether the government's line of questioning was reasonable, (3) whether the limiting instruction was immediate, clear, and forceful, (4) whether the government evidenced any bad faith, and (5) whether the testimony was only a small part of the evidence against the defendant. *Zuern v. Tate*, 336 F.3d 478, 485 (6th Cir. 2003) (citing *United States v. Forrest*, 17 F.3d 916, 920 (6th Cir. 1994)).

Before considering these factors, however, "[w]here a defendant argues that the district court should have granted a mistrial due to improper testimony . . . we must first consider whether the challenged testimony was in fact improper." *United States v. Howard*, 621 F.3d 433, 458 (6th Cir. 2010). Explicit testimony regarding a defendant's probation or parole status "may increase the potential for unfair prejudice to the defendant by highlighting the defendant's recent criminal history." *United States v. Griffin*, 389 F.3d 1100, 1103 (10th Cir. 2004) (citing *United States v. Robertson,* 19 F.3d 1318, 1324 (10th Cir.1994)). As a general matter, trial courts should exercise caution in the admission of such testimony. *See United States v. Pierce,* 136 F.3d 770, 776 (11th Cir.1998).

However, "where the government is required to prove as an element of the offense that the defendant has previously committed a felony, as in a felon-in-possession prosecution, the potential for prejudice from the jury hearing evidence of parole status is substantially lessened." *United States v. Wiseman*, 932 F.3d 411, 419–20 (6th Cir. 2019) (cleaned up). "While in the ordinary course of most criminal trials revelations of the defendant's parole status might provoke a mistrial," where the charged offense is felon in possession of a firearm under 18 U.S.C. § 922(g)(1),

18

supervision status amounts to "little more than incidental information." *United States v. Hines*, 943 F.2d 348, 354 (4th Cir. 1991). In fact, in such cases where parole or probation status was accidentally disclosed, the lesser potential for prejudice often renders unnecessary consideration of the factors that the Sixth Circuit set forth in *Zuern*.

For example, testimony that the defendant had been "on the run" from his probation officer was not "per se prejudicial," not only because the court gave a curative instruction but also because the defendant was charged with a violation of Section 922(g)(1) and there was a stipulation to his prior convictions. *United States v. Beamus*, 110 F. App'x 513, 517 (6th Cir. 2004). Similarly, where a testifying police officer mentioned incidentally that a defendant's status as a parolee made it easier to acquire legal access to search his room, a stipulation to a prior conviction in a felon-in-possession case greatly mitigated concerns of resulting prejudice. *United States v. Griffin*, 476 F. App'x 592, 597 (6th Cir. 2011) (finding that evidence of parole status was not unfairly prejudicial because of the nature of the offense tried and because the defendant's evidence of guilt was overwhelming).

In this context, even intentional and strategic disclosures of probation or parole status are not necessarily improper. In *United States v. Houston*, a prosecution under Section 922(g)(1), prosecutors presented the defendant's own statements about his parole status as evidence of consciousness of guilt. 110 F. App'x 536, 540 (6th Cir. 2004). Because of a stipulation to his prior conviction, "[t]he most that the fact of parole added to the stipulation . . . was that [the defendant's] prior conviction was

19

relatively recent." *Id.* This fact alone did not outweigh the otherwise probative value of the evidence. *Id.* In *United States v. Hines*, 943 F.2d 348, 354 (4th Cir. 1991), a parole officer's testimony that the defendant violated his probation by traveling without prior approval was presented deliberately "to show that he may have had an intention to violate the law." Noting that such testimony might risk a mistrial in most other contexts, the court found it was not overly prejudicial in a felon-in-possession case. *Id.*, at 353–54.

Here, the United States exhibited far more caution and restraint than is evident in *Houston* or *Hines*. Far from setting out to make tactical use of Defendant's status on supervised release or his criminal past, counsel for the United States appear to have done their best to avoid introducing the information unnecessarily. Awkward though it might have been, they presented the testimony of Manuel Perez as the testimony of a mere "government employee" acquainted with Mr. Chew for unspecified reasons. No court order compelled such precautionary measures. Despite those efforts, a witness mentioned Mr. Chew's status on supervised release without prompting at the end of a day of trial. In this respect, this case more closely resembles instances where a witness mentions parole status incidentally. *See, e.g., Beamus*, 110 F. Appx. at 517; *Griffin*, 476 F. App'x at 597.

Nor did Special Agent Miles's disclosure result in actual prejudice to Mr. Chew. His criminal history was an element of the offense, and the subject of a stipulation read to the jury. Therefore, jurors knew that he was a felon or, more accurately, that he was "convicted of a crime punishable under the laws of the State of California by

20

a term of imprisonment exceeding one year." (ECF No. 79, PageID #658.) Because Alan Johnson testified that he was a felon on probation, the jury also knew that Mr. Chew associated with someone who had a significant criminal background and whose crimes were somewhat recent.

At most, Special Agent Miles's disclosure *might* have added to the jury's pool of knowledge the fact that Mr. Chew's offenses were also somewhat recent. But such an inference assumes that the jurors did not already figure out from Ashlee Frank's testimony that Johnson and Mr. Chew were detained and housed together in California or that they did not discern the similarities between the ways Frank and Perez described their respective jobs. Even if the disclosure from Special Agent Miles came as news to the jury, any prejudice to Mr. Chew on the facts of this case is slight.

Indeed, the United States presented extensive evidence unrelated to Defendant's past and his status on supervised release. The Greyhound bus tickets and corresponding cell phone location data demonstrated that Mr. Chew visited Akron, Ohio at the relevant times. His connection to Kathryn Coe was established not only by his cell phone location data that followed her routes of travel on February 22 and 29, 2024, but also by the text messages the two exchanged. Alan Johnson's testimony established that Mr. Chew had use of his house and car during the time Coe recalled visiting that house and was spotted using that car to visit the Cleveland Armory on February 29, 2024. Additionally, surveillance cameras at the Yours Truly restaurant captured images of Coe and Mr. Chew together shortly before her trip to the Parma Gun Shop. Although Special Agent Miles used Manuel Perez's help to

21

make a positive identification at a critical juncture in the investigation, the evidence acquired after Perez's assistance by itself suffices to support the jury's verdict.

Therefore, Special Agent Miles' disclosure of Mr. Chew's supervised release status did not cause violate Rule 403 or cause unfair prejudice. Accordingly, the Court need not consider the matter further.

## II.    Ineffective Assistance of Counsel

Defendant also requests a new trial based on his counsel's cross-examination that opened the door to evidence the Court otherwise excluded. He believes it probable that, but for his counsel's error, "at least one juror would have harbored reasonable doubt as to the possession counts and the scope of the alleged conspiracy." (ECF No. 99, PageID #2061.) Defendant contends that his trial counsel's error constitutes ineffective assistance of counsel such that he was effectively deprived of his Sixth Amendment right.

To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy the two-pronged test that the Supreme Court established in *Strickland v. Washington*, 466 U.S. 668 (1994). *See, e.g., Wingate v. United States*, 969 F.3d 251, 255 (6th Cir. 2020) (citation omitted). First, the defendant must show that his defense attorney's conduct was "deficient." *Strickland*, 466 U.S. at 687. Specifically, he must show that counsel's errors were so serious that she failed to "function[ ] as the 'counsel' that the Sixth Amendment guarantees to Petitioner." *Id.* at 687–88. Counsel enjoy a presumption that they discharge their duties in a sufficiently effective manner and exercise reasonable professional judgment based on the circumstances at the time. *Id.* at 689–90. To establish error, a defendant must

22

overcome this "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* This means that courts should "resist the temptation to rely on hindsight . . . in the context of ineffective assistance of counsel claims." *Carson v. United States*, 3 F. App'x 321, 324 (6th Cir 2001).

Second, a defendant must show that any deficiencies in his counsel's performance were "prejudicial" to his defense. *Id.* at 690. In other words, he must show that his counsel's decisions "were so serious as to deprive [him of] a fair trial, a trial whose result is reliable." *Id.* at 687; *see also Monea v. United States*, 914 F.3d 414, 419 (6th Cir. 2019). Like the first *Strickland* element, establishing prejudice also presents a difficult burden because it requires the defendant to show a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the [original] outcome." *Id.*

A successful ineffective assistance claim requires a defendant to establish both elements. *Strickland*, 466 U.S. at 687, 697. Therefore, failure to establish either element will cause this claim to fail. Although prejudice is the second element under *Strickland*, "[c]ourts need not address the first element if the petitioner cannot prove prejudice. In fact, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Monea*, 914 F.3d at 419 (citation modified).

The testimony that resulted when defense counsel opened the door was brief and limited. In substance, it placed before the jury the fact that one of the four firearms that Coe purchased was recovered in Berkeley, California but was not in the possession of the ATF. (ECF No. 88, PageID #1670 & 1700–01.) Notably, the jurors were not asked to decide whether Mr. Chew owned or distributed the firearms while in California, but rather whether he was responsible for Coe's purchase of four firearms and then actually or constructively possessed those firearms as their intended recipient. Other evidence, even if less direct, allowed the jury to find that Mr. Chew traveled with the firearms from Ohio to California. And, as previously discussed, extensive evidence (including video surveillance) connected Mr. Chew to Coe and supported the finding that he was with her in Ohio on the days she made the purchases in question. In the context of the complete evidentiary record, the brief testimony that a firearm was recovered in California did not materially change the mix of information that the jury had, let alone decisively affect the trial's result.

Ultimately, Defendant's claim fails to show a "reasonable probability" that, but for this testimony, "the result of the proceeding would have been different." *Bethune v. United States*, No. 1:24-cv-848, 2025 WL 3264477, at *6 (N.D. Ohio Nov. 24, 2025) (quoting *Strickland*, 466 U.S. at 694). Therefore, it fails to establish ineffective assistance of counsel.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendant's Rule 33 motion (ECF No. 99).

24

**SO ORDERED.**

Dated:  May 6, 2026

J. Philip Calabrese
United States District Judge
Northern District of Ohio

25